J-A25015-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| BARBARA BANASIAK, EXECUTRIX OF THE ESTATE OF DAVID BANASIAK BARBARA BANASIAK, INDIVIDUALLY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | No. 2041 EDA 2023 |
| | : | |
| JAMES ROBINSON, WHEATON WORLD WIDE MOVING, BEKINS VAN LINES, INC., BEKINS A-1 MOVERS, INC., ACE MOVING AND STORAGE, ACE MOVING AND STORAGE CORP. AND ACE MOVING AND STORAGE INC. | : | |

Appeal from the Judgment Entered November 13, 2023
In the Court of Common Pleas of Pike County Civil Division at No(s):
2015-00376

| | | |
|---|---|---|
| BARBARA BANASIAK, EXECUTRIX OF THE ESTATE OF DAVID BANASIAK BARBARA BANASIAK, INDIVIDUALLY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JAMES ROBINSON, WHEATON WORLD WIDE MOVING, BEKINS VAN LINES, INC., BEKINS A-1 MOVERS, INC., ACE MOVING AND STORAGE, ACE MOVING AND STORAGE CORP. AND ACE MOVING AND STORAGE INC. | : | No. 2120 EDA 2023 |
| | : | |
| Appellants | : | |

Appeal from the Judgment Entered November 13, 2023

In the Court of Common Pleas of Pike County Civil Division at No(s):
2015-00376

BEFORE: OLSON, J., DUBOW, J., and LANE, J.

MEMORANDUM BY OLSON, J.:                    **FILED FEBRUARY 24, 2025**

In this consolidated appeal, Appellants/Cross Appellees, Barbara Banasiak, individually, and as Executrix of the Estate of David Banasiak, appeal from the judgment in the amount of $74,957.24, representing unreimbursed medical expenses, entered November 13, 2023 in the Court of Common Pleas of Pike County. In addition, James Robinson ("Robinson"), Wheaton World Wide Moving, Bekins Van Lines, Inc., Bekins A-1 Movers, Inc., Ace Moving and Storage, Ace Moving and Storage Corp., and Ace Moving and Storage, Inc. (collectively, "Appellees/Cross Appellants"), appeal from the judgment entered following the denial of their post-trial motion for judgment notwithstanding the verdict and/or a new trial. We affirm, in part, reverse, in part, and remand for a new trial limited to damages for Mr. Banasiak's pain and suffering and Mrs. Banasiak's claim of loss of consortium.

On December 5, 2014, David Banasiak, a 74-year-old retiree, and his wife, Barbara Banasiak (the "Banasiaks") were in the process of moving from their home in Dingmans Ferry, Pennsylvania, to a new home in California. The Banasiaks used "moving services provided by Wheaton World Wide Moving, Bekins Van Lines, and Ace Moving Storage, [as well as] a moving truck operated by [Mr.] Robinson" to facilitate their move. Trial Court Opinion, 10/27/23, at 1-2. In the evening, after the moving truck was fully loaded,

Mr. Banasiak and Mr. Robinson decided to move the moving truck and Mr. Banasiak's vehicle.  Mr. Robinson proceeded to the moving truck, with Mr. Banasiak following shortly thereafter.  Ultimately, Mr. Banasiak fell into the path of the truck, which ran over both of his legs.

Mr. Banasiak was subsequently transported *via* ambulance to Pocono Medical Center, wherein he was diagnosed "with significant multiple trauma," namely, "multiple lower-extremity contusions, including an injury to his left thigh; an open right tibia-fibula fracture; right third and fourth metatarsal base fractures [(in his feet)]; and multiple left lower-extremity phalanx." Deposition of Martin Schaeffer, M.D., 6/2/23, at 17.[1]  After multiple washout and surgical debridement procedures, doctors determined that Mr. Banasiak's right leg was not salvageable.  As such, an above-the-knee amputation surgery was performed on December 15, 2014.

On December 23, 2014, Mr. Banasiak was transferred to Orange Regional Medical Center in Middletown, New York, where he underwent "intensive physical therapy, occupational therapy, recreational therapy, and nursing assessments and treatments for his medical and rehabilitation conditions."  ***Id.*** at 22.  He was discharged on January 16, 2015.  The Banasiaks flew to California on January 17, 2015.

On January 19, 2015, Mr. Banasiak went to Saddleback Memorial Medical Center in California complaining of "a nonhealing wound to his left

---

[1] Dr. Schaeffer testified at trial *via* deposition.  ***See*** N.T. Trial, 6/13/23, at 133.

thigh." *Id*. at 24. A wound culture was performed, revealing methicillin-resistant Staphylococcus aureus ("MRSA"). In addition, on January 20, 2015, Mr. Banasiak developed a fever and was "having drainage from his left leg wound." *Id.* at 25. As such, Mr. Banasiak underwent emergency surgery namely, a wound vac, for his left leg. A "subsequent surgical procedure with a skin graft," as well as another wound vac, was performed on January 25, 2015. *Id*. at 28. The wound vac was then removed on January 30, 2015.

Thereafter, Mr. Banasiak was fitted for an above-the-knee prosthesis for his right leg, for which he underwent additional medical care, including physical therapy. At that time, he developed a neuroma, a "collection or irritation of nerves," as well as phantom limb pain. *Id.* at 30. Ultimately, Mr. Banasiak died on September 16, 2016 of colon cancer.

The Banasiaks instituted the instant negligence action against Appellees/Cross Appellants, alleging, *inter alia*, that Mr. Robinson caused the December 5, 2014 accident and, as a result, Mr. Banasiak sustained injury. The matter proceeded to a jury trial on June 12, 2023. At trial, Appellees/Cross Appellants claimed that Mr. Banasiak's own negligence, not Mr. Robinson, caused the December 5, 2014 accident. Appellees/Cross Appellants also challenged the Banasiaks' claim that Mr. Banasiak endured pain and suffering as a result of the December 5, 2014 accident. To do so, Appellees/Cross Appellants pointed to Mr. Banasiak's pre-existing conditions, which included "diabetes, peripheral neuropathy, peripheral vascular disease,

hyperlipidemia, and . . . [previously,] colon cancer." N.T. Trial, 6/13/23, at 122. In addition, Appellees/Cross Appellants questioned the Banasiaks' medical experts about the fact that, before the accident, Mr. Banasiak took a high dose of Gabapentin, a medication that treats nerve pain, three times a day but that, at the scene of the accident, Mr. Banasiak denied pain management, claiming that he did not have any feeling in his legs "[d]ue to prior medical problems." *Id.* at 124.

"On June 15, 2023, following four [] days of trial, the jury returned a verdict finding . . . [Mr.] Robinson [51%] negligent, [Mr.] Banasiak [49%] negligent, and awarding $74,957.24 to [Mr.] Banasiak, for past medical expenses." Trial Court Opinion, 10/27/23, at 2. The jury awarded $0.00 to Mr. Banasiak for pain and suffering and $0.00 to Mrs. Banasiak for loss of consortium.

Thereafter,

> [o]n June 23, 2023, [the Banasiaks] filed a motion for post[-]trial relief[,] alleging that the verdict was against the weight of the evidence and requesting a new trial to be held on the issue of damages pursuant to Pa.R.C.P. 227.1(a)(1). On June 29, 2023, [the trial court] denied [the Banasiaks'] motion. On July 3, 2023, [Appellees/Cross Appellants] filed a motion for post-trial relief pursuant to Pa.R.C.P. 227.1 . . . requesting entry of judgment notwithstanding the verdict in [their favor] and a cross-motion for post-trial relief seeking a new trial as to all issues. On July 5, 2023, the trial court issued an order denying [Appellees/Cross Appellants'] motion.

*Id.* (unnecessary capitalization omitted). This appeal followed.

The Banasiaks raise the following issue for our consideration:

Whether the trial court erred in denying [their] post-trial motion requesting a new trial on damages where the jury found that [Appellees/Cross Appellants] were 51% negligent and that [Appellees/Cross Appellants'] negligence was a factual cause of the harm to [the Banasiaks], but nevertheless awarded zero damages for Mr. Banasiak's uncontested claims of pain and suffering and disfigurement and zero damages for Mrs. Banasiak's uncontested claim of loss of consortium[?]

Banasiaks' Brief at 2.

Appellees/Cross Appellants raise the following issues for our consideration:

1. Whether the trial court erred by denying Mr. Robinson's motion for judgment notwithstanding the verdict where (1) [the Banasiaks] failed to establish a *prima facie* case of negligence as to [Appellees/Cross Appellants]; (ii) [the Banasiaks] proffered theories of negligence, suggesting that drivers are required to know the existence and exact whereabouts of any pedestrian – at all times – before moving and that the mere happening of an accident necessarily involves negligence, were contrary to well-established Pennsylvania law; and (iii) the jury's verdict finding Mr. Robinson negligent was against the weight of the evidence[?]

2. Whether the trial court erred in denying Mr. Robinson's post-trial motion for a new trial on all issues based on its denial of Mr. Robinson's requested jury instructions on negligence, which constituted a material error and prejudiced Mr. Robinson[?]

Appellees/Cross Appellants' Brief at 4-5 (unnecessary capitalization omitted) (emphasis added).

We first address the Banasiaks claim that "the trial court's refusal to grant a new trial on damages constitutes an abuse of discretion." Banasiaks' Brief at 33. The trial court herein held that the jury award of $74,957.24, the

stipulated amount of Mr. Banasiak's medical expenses, and decision to "not award Mr. Banasiak anything . . . for his pain and suffering claim or to award Mrs. Banasiak anything for her loss of consortium claim" was not against the weight of the evidence or shocking to one's sense of justice. Trial Court Opinion, 10/27/23, at 4. In support of its conclusion, the trial court stated:

> Mr. Banasiak was a 74-year-old man with several pre-existing conditions at the time of the incident and eventually succumbed to colon cancer prior to trial. The jury did not have the opportunity to hear from Mr. Banasiak, but did hear from [the Banasiaks'] expert, [] Peter Salgo, [M.D., F.A.C.P.,] who was accepted as an expert in intensive care medicine and pain and suffering. Dr. Salgo testified that Mr. Banasiak suffered grievous injuries and would have suffered pain. On cross[-]examination, Dr. Salgo acknowledged that he never actually [treated] Mr. Banasiak, but was hired to review his medical records and provide an opinion based on the same. He also acknowledged that Mr. Banasiak suffered from diabetes, peripheral neuropathy, peripheral vascular disease, hyperlipidemia, and colon cancer prior to the incident. Dr. Salgo also recognized, in accord with his past medical records, Mr. Banasiak [took] Gabapentin three [] times each day prior to the incident for pain in his lower right limb. Further, Dr. Salgo testified that he reviewed the [emergency medical technicians ("EMT")] reports which reflected that Mr. Banasiak had no feeling in his extremity, showed no signs of shock, and denied pain management at the scene of the incident. As [the factfinder], the jury was free to assess Dr. Salgo's credibility and give his testimony whatever weight, if any, they deemed fit.
>
> In addition to Dr. Salgo, the jury heard from Barbara Banasiak, wife of Mr. Banasiak. Mrs. Banasiak testified that she was in a fog on the date of the accident and the ways in which the subsequent amputation of Mr. Banasiak's leg interfered with their daily living and future; and that the use of a prosthetic device caused Mr. Banasiak pain. She also described the impact of Mr. Banasiak's conditions on herself. Mrs. Banasiak[, however,] acknowledged that Mr. Banasiak's health started to deteriorate for reasons unrelated to the incident. Again, as [the

factfinder], the jury was free to make credibility determinations as to Mrs. Banasiak and give her testimony whatever weight, if any, they deemed fit.

*** 

[The trial court is, therefore,] convinced that the jury in this case possessed all the information and instruction necessary to make a well-reasoned award in this matter. That the jury failed to make any award for pain and suffering, disfigurement, and/or loss of consortium was not unreasonable, especially considering that . . . [Mr.] Banasiak[] was found very nearly equally negligent for the conduct which caused his injuries.

**Id.** at 4-6.

On appeal, the Banasiaks initially argue that Mr. Banasiak's "catastrophic" injuries were "obviously the type of injuries 'to which human experience teaches there is accompanying pain.'" Banasiaks' Brief at 31 (citation omitted). The Banasiaks further contend that Appellees/Cross Appellants "did not contest causation," as they "did not [present] any evidence," by way of expert opinion or otherwise, that "Mr. Banasiak's injuries and resulting pain and suffering and disfigurement was caused by anything other than the accident." **Id.** at 34. In light of the foregoing, the Banasiaks contend that the jury's subsequent failure to award damages for Mr. Banasiak's pain and suffering was "clearly inadequate" and contrary to the evidence. **Id.** at 37. In this same vein, the Banasiaks take issue with the jury's failure to award damages for loss of consortium. The Banasiaks similarly contend that Mrs. Banasiak's testimony, which was not subject to cross-examination, established her loss of enjoyment of life and companionship with Mr. Banasiak. **See id.** at 30.

This Court previously stated:

We have held that [t]he decision whether to grant a new trial on weight of the evidence grounds rests within the discretion of the trial court and that decision will not be disturbed absent an abuse of discretion. An abuse of discretion occurs when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias or ill will. Furthermore, a new trial based upon a weight of the evidence claim should be granted to a party:

only where the verdict is so contrary to the evidence as to shock one's sense of justice [and not] where the evidence is conflicting [or] where the trial judge would have reached a different conclusion on the same facts.

We have held that it is the duty of the trial court to control the amount of the verdict; it is in possession of all the facts as well as the atmosphere of the case, which will enable it to do more evenhanded justice between the parties than can an appellate court. Thus, a jury verdict is set aside for inadequacy when it appears to have been the product of passion, prejudice, partiality, or corruption, or where it clearly appears from uncontradicted evidence that the amount of the verdict bears no reasonable relation to the loss suffered by the plaintiff. Hence, a reversal on grounds of inadequacy of the verdict is appropriate only where the injustice of the verdict [stands] forth like a beacon.

*Womack v. Crowley*, 877 A.2d 1279,1282–1283 (Pa. Super. 2005) (internal citations and quotation marks omitted).

It is the general rule that "victims . . . must be compensated for all that they lose and all that they suffer from the tort of another." *Boggavarapu v. Ponist*, 542 A.2d 516, 518 (Pa. 1988). The injury, however, must result in compensable pain. *Id.* In some instances, a jury may determine that an

alleged injury is nothing more than "a transient rub of life and living." *Id.* On the other hand, "there are injuries to which human experience teaches there is accompanying pain." *Id.*

> Those injuries are obvious in the most ordinary sense: the broken bone, the stretched muscle, twist of the skeletal system, injury to a nerve, organ or their function, and all the consequences of any injury traceable by medical science and common experience as sources of pain and suffering.

*Id.* While a juror may "not to be faulted . . . if they do not believe all they are told and all that their common experience does not accept," a juror may not "disregard obvious injury." *Id.*

In *Davis v. Mullen*, 773 A.2d 764 (Pa. 2001), our Supreme Court addressed whether a jury's award for medical expenses, without compensation for pain and suffering, was against the weight of the evidence. In *Davis*, the plaintiff, Jody Davis, brought action against Jeffrey Mullen, alleging that he sustained injuries after Mullen's vehicle "crossed the line dividing the two-way road and collided, head on, with Davis' fully loaded tractor-trailer." *Id*. at 765. Davis was transported *via* ambulance from the scene of the accident to a hospital, where he was "examined, x-rayed and discharged the same morning with a prescription to obtain medication for pain." *Id*. Davis "testified that he was in pain over the weekend, but that on Monday . . . he resumed his ten hour-a-day, five to seven day-a-week work schedule driving the tractor-trailer." *Id*. Nonetheless, Davis did have "pain in his low back and neck," as well as a "tingling feeling running down his leg."

- 10 -

*Id.* As such, Davis began treatment with a chiropractor 20 days after the accident. "After [20] visits with [the chiropractor], Davis stopped treatment and [did] not [seek] any further therapy or take[] any pain medication for the injuries [he sustained]." *Id.*

Davis eventually brought suit against Mullen, seeking damages arising out of the accident. "At trial, Mullen admitted liability . . . but disputed the extent of Davis's injuries." *Id.* The main dispute was whether the accident with Mullen, or the three prior automobile accidents in which Davis was involved, caused his spinal injury. Ultimately, the jury awarded Davis damages for his medical expenses but did not compensate him for pain and suffering. Davis appealed, arguing that the jurors' failure to compensate him for pain and suffering constituted an error of law. Our Supreme Court disagreed.

At the outset, our Supreme Court attempted to "reconcile two lines of cases" that provided "seemingly inconsistent holdings." *Id.* at 766-767. In the first line of cases, the Supreme Court "upheld the authority of trial courts to order new trials where the jury's award of medical expenses, without awarding damages for pain and suffering, was inconsistent and 'totally inadequate.'" *Id.* at 767; *citing* ***Todd v. Bercini***, 92 A.2d 538 (Pa. 1952); ***Yacabonis v. Gilvickas***, 101 A.2d 690 (Pa. 1954). The High Court noted that, in both ***Todd*** and ***Yacabonis***, the "plaintiffs' injuries were too severe" and, as such, the "jury's determination that they did not suffer pain was 'totally inadequate' and required a new trial." *Id.*; *see* ***Todd***, ***supra*** at

- 11 -

538-539 (noting that the plaintiff sustained serious, permanent neck injuries as a result of the accident); *see also Yacabonis*, *supra* at 692 (noting that the plaintiff lost consciousness, received 10 stitches, and was left with a permanent, disfiguring scar above her left eyebrow as a result of the accident).

In the second line of cases, however, the Supreme Court "focused on the power of the jury as the ultimate finder of fact" and, in turn, upheld a "jury award for medical expenses without a corresponding award for pain and suffering." *Davis, supra,* at 767, *citing* *Boggavarapu*, 542 A.2d at 518 (holding that the trial court erred in granting the plaintiff's motion for a new trial because the jury was "not obliged to believe that every injury[, in this case, a dog bite,] causes pain or the pain alleged"), *Catalano v. Bujak*, 642 A.2d 448, 451 (Pa. 1994) (holding that the trial court erred in granting the plaintiff's motion for a new trial because the defendant presented evidence that he did not cause the plaintiff's injuries and, as such, the jury apparently "did not believe that pain and suffering . . . resulted from the injury which [the defendant] . . . caused"). In light of the foregoing, the Supreme Court held that a court must not disturb a jury's

> award of medical expenses without compensation for pain and suffering . . . where the trial court had a reasonable basis to believe that: (1) the jury did not believe the plaintiff suffered any pain and suffering, or (2) that a pre[-]existing condition or injury was the sole cause of the alleged pain and suffering.

*Davis*, 773 A.2d at 767.

The **Davis** Court then went on to affirm the trial court's order denying Davis's motion for a new trial. In so doing, it noted that, at trial,

> Davis admitted that: he did not miss any work as a result of the accident; he waited [20] days after the accident before visiting a doctor; he quit treatment after only [20] visits with the doctor; and, he ha[d] not received any medical treatment for the injuries he claims to have suffered as a result of the accident since July of 1995. Davis' doctor also admitted that he could not say for certain if the spinal injury was related to the accident or whether it was caused by some other event.

*Id.* at 770. Based upon the foregoing, the High Court held that "there was a reasonable basis for the jury [to] believe: (1) that Davis did not suffer pain and/or (2) that his alleged injury was not caused by the negligence of the defendant." *Id.*

Thereafter, in two separate cases, this Court addressed substantially similar scenarios, namely, a jury's award for medical expenses, without compensation for pain and suffering, in the context of allegations of a pre-existing condition. *See Zeigler v. Detweiler*, 835 A.2d 764, 767 (Pa. Super. 2003). In **Zeigler**, there was an automobile accident between Patricia Zeigler and Roderick Detweiler, who was driving a delivery van in the course of his employment with the Flower Shop of Hummelstown. "The two vehicles were stopped at a red traffic light [but] headed in opposite directions." *Id.* at 766. Detweiler "made a left hand turn across the intersection in front of [Zeigler], resulting in a collision." *Id.* As a result of the accident, Zeigler claimed that

- 13 -

> she suffered injuries which required her to undergo a course of treatment that included epidural injections and back surgery. [Her] experts at trial [also] testified that the accident aggravated [Zeigler's] spinal stenosis and degenerative disc disease, necessitating her later surgery.

*Id*. At the conclusion of trial, the jury determined that Detweiler and, by virtue of Detweiler's employment, the Flower Shop of Hummelstown, were negligent and that their negligence was a substantial factor in causing Zeigler's injury. The jury awarded $5,222.14 for medical expenses, but did not issue an award for Zeigler's pain and suffering. Zeigler filed a post-trial motion, seeking a new trial limited to the issue of damages. The trial court granted Zeigler's motion.

On appeal, this Court addressed whether the trial court erred in granting Zeigler's motion for a new trial. Citing *Davis*, *supra*, Detweiler claimed that a new trial was not warranted because liability and the issue of whether the accident caused Zeigler injury was disputed at trial. *Id*. at 767. Ultimately, this Court affirmed the trial court's order granting a new trial. In so doing, we recognized that the trial court properly concluded that "the nature, extent and duration of [Zeigler's] pain and suffering were not due solely to the pre[-]existing injury." *Id*. at 769. It was therefore "'simply not reasonable for the jury to conclude that [Zeigler] experienced no pain and suffering.'" *Id*. (citation omitted).

Two years later, this Court followed a similar line of reasoning in *Womack*, *supra*, the facts of which are as follows. The plaintiff "was traveling west. . . when the car she was driving was hit from behind by a car driven by

- 14 -

[the defendant]." ***Id.*** at 1280. "The force of the impact caused [the plaintiff] to be thrown forward and her left leg and knee to twist." ***Id.*** Even though the plaintiff was "shaken up and scared," she was not in immediate pain and, as such, "declined to go to the hospital immediately after the accident." ***Id.*** By the time she arrived home, however, the plaintiff "began experiencing 'excruciating pain' in her back." ***Id.*** Accordingly, she went to the hospital wherein she "was diagnosed with a post-motor vehicle accident thoracic strain, given pain medication and released." ***Id.*** The next morning, the plaintiff also "began experiencing swelling, spasms and pain in her left knee." ***Id.*** Ultimately, after the plaintiff attended physical therapy for her knee for six months, she was referred to an orthopedic surgeon "who treated her on two separate occasions with 'very painful injections of steroids' and, as such, "recommended that [she] have arthroscopic surgery on her left knee for [a] torn meniscus." ***Id.***

Thereafter, the plaintiff initiated a negligence action, seeking damages for the personal injuries she sustained as a result of the accident. At trial, there was evidence that, 15 years before the accident, the plaintiff "suffered a back injury when she was a victim of a robbery" and that she underwent treatment for this injury for seven years. ***Id.*** At the conclusion of trial, the jury found that the defendant was negligent and that her negligence was a substantial factor in causing the plaintiff's harm. The jury awarded $6,000.00 in damages, "the exact amount of the surgeon's fee for the [knee surgery the plaintiff needed]." ***Id.*** at 1281. The plaintiff filed a post-trial motion, alleging

that the verdict was against the weight of the evidence and requested a new trial on damages. The trial court agreed, finding that the jury's decision to make "no award for pain and suffering" was "unreasonable . . . in view of her uncontroverted testimony and injuries." *Id***.**

On appeal, this Court addressed whether the trial court erred in granting a new trial. This Court upheld the trial court's order. In so doing, we initially noted that the "jury clearly found that [the defendant's] negligence was a substantial factor in causing [the plaintiff's] injuries." *Id***.** at 1264. Then, we found that, "because [a] torn meniscus and [a] back sprain are the type of injuries which . . . involve pain and suffering," the jury's "award [bore] no reasonable relation to the [plaintiff's] injuries." *Id***.**, *citing* ***Burnhauser v. Bumberger***, 745 A.2d 1256, 1261 (Pa. Super. 2000) (holding that because the plaintiff suffered from soft tissue injuries for six months after the accident, which is the type of injury which "normally involve[s] pain and suffering," the jury should have awarded damages for pain and suffering); ***Marsh v. Hanley***, 856 A.2d 138 (Pa. Super. 2004) (holding that the plaintiff suffered compensable injury as evidenced by the fact that the plaintiff experienced neck and back pain for six months after the accident and, as such, the jury's failure to make an award for pain and suffering bore no reasonable relationship to the loss suffered). Based upon the foregoing, the ***Womack*** Panel affirmed the trial court's order granting a new trial as to the issue of damages.

In this case, the Banasiak's expert, Dr. Salgo, testified at trial regarding Mr. Banasiak's injuries. Initially, Dr. Salgo opined that, as a result of the

moving truck rolling over Mr. Banasiak's legs, Mr. Banasiak sustained "tremendously grievous injuries." N.T. Trial, 6/13/23, at 96. In particular, Dr. Salgo provided the following testimony regarding Mr. Banasiak's initial injuries.

Q. [W]hat were [Mr. Banasiak's] injures?

A. Well, what happened was as [the truck] rolled over both of his legs, both of his legs got crushed. His right leg as I recall suffered fractures and these were terrible fractures. They were open fractures which means that the –

Q. And I [am] going to stop you for a second I do [not] mean to point at any, but grade three, open common noted fractures of the tibia and fibula of the right leg.

***

Q. Explain to the [j]ury what that means. Can you describe that?

A. I can. A grade three injury is a severe injury of the bone. There [are] impact injuries, as the bone gets driven upward into other bones. The tibia and fibula are the two bones in your lower leg, and an open fracture means that the skin and muscle tissue and connected tissue above the bone is open to air. So it [is] sliced open or crushed open, and then underneath the bone is fractured and you can usually see the bone inside, looking at it as you see the victim. That [is] a terrible injury and it [is] terrible for lots of reasons. Open means it is particularly susceptible to becoming infected. They had to treat for that, but this kind of injury is destructive because it is a crush injury of blood vessels in the area a[s] well, so it often decreases the blood supply to the area which nourishes tissue and bone and it may make the whole limb unsalvageable. The actual pain of a fracture like this is caused at least in part because the bone is covered with something called a periosteum which is very thin, delicate tissue which has tons of nerve endings in it, and when you cut it, fracture it, rip it, all of which occurred here. They are sending signals saying this hurts a lot. This is exquisite pain. Fractured bones hurt a lot and in this case we have two fractured bones that have been driven

into other bones because it [is] a grade three fracture and the periosteum is in tatters, and the bone itself is destroyed in many places. So this is about as bad, painful injury as you can have in terms of bone.

*Id.* at 96-97. Dr. Salgo also testified that Mr. Banasiak suffered from soft tissue injuries in his left leg, as well as fractures in both his feet. *Id.* at 100-101.

As a result of the aforementioned injuries, Dr. Salgo testified that Mr. Banasiak underwent multiple surgeries. Initially, the doctors performed a "washout" procedure which "is exactly what it sounds like," *i.e.*, the doctors "opened up [Mr. Banasiak's] leg and washed it out" to remove "road debris, tire debris . . . bugs [and other] bacteria." **Id**. at 102. Then, the doctors placed "an external fixator on [Mr. Banasiak's] right leg." **Id**. This involved placing "a halo above, a halo below with [] big metal things . . . [on the] outside [of] the leg with pins . . . driven through the bones to keep it aligned so that it begins to heal." **Id**. at 102-103. Thereafter, the doctors conducted three additional washout procedures and "further debridement." **Id**. at 103. Finally, on December 15, 2014, upon recognizing that Mr. Banasiak's right leg was not salvageable, the doctors performed an above-the-knee amputation. **Id**. at 108.

The Banasiaks also presented testimony detailing the multiple complications Mr. Banasiak experienced post-amputation. More specifically, Martin Schaeffer, M.D. testified that, in January 2016, Mr. Banasiak suffered a nonhealing wound to his left thigh and that subsequent testing revealed that

it was infected with MRSA. *See* Deposition of Martin Schaeffer, M.D., 6/2/23, at 24-28. This required additional surgery, including the placement of a skin graft and two wound vacs. *Id.* In addition, Dr. Salgo testified that Mr. Banasiak suffered from a neuroma in the stump of his right leg, which required steroid injections for treatment. Dr. Salgo described a neuroma as "abnormal growth of nerve like tissue" that "hurts when you touch and it hurts when you put pressure on it." N.T. Trial, 6/13/23, at 110. There was also testimony that Mr. Banasiak suffered from phantom limb pain after his right leg was amputated. Dr. Salgo described phantom limb pain as follows.

> Phantom limb pain is mysterious. The brain from the time you [are] born until the time they take a limb off knows that there is a limb out there. It knows you [have] got two legs and it interprets nerve impulses coming from each leg appropriately. I got pain in my right leg. I got pain in my left leg, but if you take a leg off as Mr. Banasiak's leg was taken off, sometimes the brain still thinks there is a limb out there. It still processes neurological information as if the leg is still there, and what [is] worse is it hurts. That is why it is called phantom limb pain, and what [is] even worse it that treating this is virtually impossible. In other words, look if you get a laceration or a fracture of a limb that exists, well I [will] go ahead and fix the fracture and I [will] give you medication to treat that pain from the fracture, narcotics, and as it heals it goes away. But here, there is nothing to heal, nothing to go away, the limb is no longer there and so the brain keeps telling you do something for my leg, but the leg is [not] there. So short of giving huge amounts of narcotics which puts you to sleep but it does [not] really make your life good, that does [not] work. They can give you drugs which can try to intercept these if you will abhorrent nerve impulses, raw nerve impulses that seem to be telling the brain that there is pain where they is [not]. Gabapentin is one of those, that does [not] work very well. … And I [will] tell you something about how bad phantom limb pain is, specifically in Mr. Banasiak, when he first complained of the pain that he had from the traumatic injury after being rolled over by the truck, it

was maybe five out of [10]. He complained of phantom limb pain and the numbers he gave was eight [out of 10]. The magnitude of the phantom limb pain was much worse long term and would [not] go away [than] the pain that he had from the original surgery.

*Id.* at 111-112. Based upon all of the foregoing, Dr. Salgo testified that Mr. Banasiak "experienced profound pain, profound suffering as a consequence of being run over by a truck." *Id*. at 116-117.

The aforementioned testimony, in large part, was not contested by Appellees/Cross Appellants. Indeed, Appellees/Cross Appellants did not set forth evidence, by way of expert testimony or otherwise, that challenged the Banasiaks' contention that Mr. Banasiak's injuries were caused by the accident. *See* N.T. Trial, 6/15/23, at 3 (defense counsel stating: "we [are] not arguing that anything caused the amputation other than this accident"). Instead, Appellees/Cross Appellants attempted to demonstrate that, because Mr. Banasiak suffered from various pre-existing conditions, namely, neuropathy, the accident did not cause him pain. The following exchange, excerpted from the cross-examination of Dr. Salgo, serves as an example of Appellees/Cross Appellants' strategy.

Q. What were the pre[-]existing conditions that Mr. Banasiak suffered from?

\*\*\*

A. He had diabetes, peripheral neuropathy, peripheral vascular disease, hyperlipidemia, and he had colon cancer and he [had] surgery for it.

Q. After the accident, immediately after the accident[,] he was awake and alert, right?

A. He was.

Q. And you also got a history of what happened in the accident[?]

A. Yes.

Q. And I [have] redacted the source because of the [trial court's] ruling, but what was the history you found or gleaned from the records as to how the accident occurred?

A. He slipped on icy pavement and his legs were run over by the trailer.

Q. Now, doctor, past medical history that you had reviewed the records from Orange Regional Medical Center, right?

A. I believe I did. Yes.

Q. And in fact those records it was noted that you talked about him having to take Gabapentin after this accident?

A. Correct.

Q. For extreme pain.

A. Yes.  Well[,] for phantom limb pain specifically.

Q. Yes.  He took Gabapentin before the accident, [correct]?

A. I believe he did.

Q. And in fact the Orange Reginal Medical Office says right lower limb was actually causing him significant pain for which he was taking high doses of Gabapentin three times a day before this accident.

A. Yes.

Q. With regard to the accident scene, you had indicated I think that he experienced immediate pain at the scene, correct?

A. He did.

Q. Did you review the EMT records though?

A. I did.

***

Q. Yes. Now with regard to the EMT records, first of all[,] when they arrived[,] they found that he was covered with a moving blanket, correct?

A. That [is] correct.

Q. And that [is] the one that Mr. Robinson had given to him.

A. I do [not] know if he gave it to him. He had a moving blanket on him.

Q. Gotcha. And then they indicate that he had no feeling in that extremity at that time, right?

A. I read that, yes.

Q. Due to prior medical problems.

*** 

A. That [is] what it said.

Q. No sign of shock, correct?

A. Right, yes.

Q. And in fact he denied pain management, a desire for pain management at that time, right?

A. That [is] what he said, yes.

N.T. Trial, 6/13/23, at 120-124. Appellees/Cross Appellants repeated this line of questioning with each of the Banasiaks' medical experts. *See* Deposition of Martin Schaeffer, M.D., 6/2/23, at 39-53; *see also* Deposition of David Meir-Levi, D.O, 6/7/23, at 37-40.[2] Hence, it is apparent that, while Appellees/Cross Appellants disputed "whether Mr. Banasiak's post-accident pain and suffering was all attributable to the accident," they did not specifically allege that Mr. Banasiak's injuries were caused by something other than the

_____

[2] Dr. Meir-Levi testified at trial *via* deposition. *See* N.T. Trial, 6/13/23, at 132.

accident, such as Mr. Banasiak's pre-existing conditions. Appellees/Cross Appellants' Brief at 27, n.7.

We believe that the instant matter is similar to **Zeigler** and **Womack**. Indeed, it is almost beyond dispute that Mr. Banasiak's injuries were caused by the accident and were "of the type that naturally and normally cause pain and suffering." **Neison v. Hines**, 653 A.2d 634, 639 (Pa. 1995). It is also apparent that Mr. Banasiak did, in fact, have significant pain and suffering, as evidenced by his substantial leg injuries, the ultimate amputation of his right leg, and his tumultuous recovery. In contrast to the Appellees/Cross Appellants claims, as well as the trial court's opinion, the mere fact that, at the scene of the accident, Mr. Banasiak denied pain management, does not negate the substantial evidence of his grievous injuries or the subsequent treatments he endured.

In addition, we find Appellees/Cross Appellants and the trial court's characterization of Mr. Banasiak's pre-existing conditions problematic, and we do so for two reasons. First, undoubtedly, there was testimony regarding Mr. Banasiak's pre-existing conditions, namely, neuropathy. In his deposition testimony, David Meir-Levi, D.O, described neuropathy as "a burning pain" or "numbness" in ones' legs. Deposition of David Meir-Levi, D.O, 6/7/23, at 40. Based upon this definition alone, we believe that the attempted comparison of neuropathy and the loss of ones' limb is specious, at best. Second, as stated above, Appellees/Cross Appellants did not dispute that the December 5, 2014 accident caused Mr. Banasiak's injuries. They did not, for example,

introduce expert testimony demonstrating that Mr. Banasiak's pre-existing conditions were the **sole** cause of his subsequent injuries.[3]  ***See Davis***, 773 A.2d at 767.  Therefore, we believe that it was unreasonable for the jury to conclude that the "nature, extent and duration of [Mr. Banasiak's] pain and suffering were [] due **solely** to the preexisting injury."  ***Zeigler***, 835 A.2d at 769 (emphasis added).  Instead, we believe that the evidence established that Mr. Banasiak suffered compensable injury.  We therefore conclude that the jury's failure to make an award for pain and suffering bore no reasonable relationship to the loss he suffered.

We now address the Banasiaks' claim that the jury's failure to award damages for Mrs. Banasiak's loss of consortium claim constituted "obvious

---

[3] In his deposition testimony, Dr. Meir-Levi testified about the assessment that the doctors conducted to determine whether Mr. Banasiak's right leg needed to be amputated.  In so doing, he explained that a normal functioning anatomy includes "three arteries that go from below the knee down to the foot:" the anterior tibial artery, the peroneal artery, and the posterior tibial artery.  Deposition of David Meir-Levi, D.O, 6/7/23, at 19.  At the time of the assessment, however, Dr. Meir-Levi testified that Mr. Banasiak had only one functioning artery, namely, "the posterior tibial artery."  ***Id***.  Dr. Meir-Levi further testified that it was "unknown" whether Mr. Banasiak's other two arteries were functional "prior to the injury or whether the injury itself . . . caused injury to the arteries."  ***Id***.  We note that this testimony, alone, is insufficient to demonstrate that Mr. Banasiak's pre-existing conditions, which Dr. Meir-Levi did not reference at this time, were the **sole** cause of his subsequent injuries. ***See Davis***, 773 A.2d at 767.  This is highlighted by the fact that, immediately after Dr. Meir-Levi's comment, he opined that it was "certainly not unlikely that [Mr. Banasiak] sustained damage to the anterior tibial artery . . . and the peroneal artery" because he sustained a "tib-fib fracture" after the accident.  ***Id***.

error" and warrants a new trial. Banasiaks' Brief at 37. This Court previously explained:

> A claim for loss of consortium is quite different from a claim for bodily injury. While the claim stems from a spouse's bodily injury, it is nevertheless a separate and distinct claim. Loss of consortium is a loss of services, society, and conjugal affection of one's spouse. One who has suffered a loss of consortium has not sustained a bodily injury but rather has experienced an injury to marital expectations.

*Farese v. Robinson*, 222 A.3d 1173, 1193 (Pa. Super. 2019) (internal citations omitted).

In this instance, Mrs. Banasiak initially testified that, before the accident, Mr. Banasiak was a "vibrant [74-year-old]," "very active," and did not have any difficulty walking, issues with balance, or trouble getting around. N.T. Trial, 6/14/23, at 7. Mrs. Banasiak then testified regarding the effect the December 5, 2014 accident had on Mr. Banasiak, as well as their relationship. In particular, Mrs. Banasiak explained that, following the amputation, the couple moved to California but could not stay with their son and daughter-in-law as they planned because their home was not wheelchair accessible. *Id.* at 12. As such, the Banasiaks moved into an assisted living facility where "there was [not] much room to move around." *Id.* at 14. Mrs. Banasiak also testified that, while living in the assisted living facility, she "did not sleep with [Mr. Banasiak]" and needed to assist him during the night by, *inter alia*, helping him "get[] out of bed to try to go to the bathroom" or by changing his colostomy bag if it leaked throughout the night. *Id.* at 18.

- 25 -

Finally, Mrs. Banasiak testified that her role as spouse shifted to that of a "caregiver" in that she assisted Mr. Banasiak with "[w]hatever he needed," including driving him to his doctors' appointments, helping him around the house, and physically assisting Mr. Banasiak get in and out of his wheelchair, a vehicle, or around their living space. *Id.* at 22-23. Mrs. Banasiak's loss of spousal services, society, conjugal affections, and the overall diminution of her marital expectations were all exclusively tied to Mr. Banasiak's accident and were uncontested, as Mrs. Banasiak's testimony was not subject to cross-examination.

Upon review, we believe that, even though Mrs. Banasiak, at times, attempted to characterize Mr. Banasiak as the epitome of health despite his various pre-existing conditions, she also presented uncontested testimony that, after the December 5, 2014 accident, the Banasiaks' relationship changed dramatically and that her "right to [Mr. Banasiak's] company, affection and cooperation was restricted." *Deitrick v. Karnes*, 478 A.2d 835, 839 (Pa. Super. 1984) (holding that the jury's failure to award damages for the wife's loss of consortium claim was "shocking and inadequate" considering the wife's uncontested testimony establishing, *inter alia*, that she could not sleep with her husband after the accident and her husband could not assist her around the house). Mrs. Banasiak's testimony was not subject to cross-examination. The jury, therefore, was not free to disregard the uncontested evidence of Mrs. Banasiak's obvious injury. We therefore

conclude that the jury's failure to award damages for Mrs. Banasiak loss of consortium was contrary to the weight of the evidence.

Based upon all of the foregoing, we hold that the trial court erred in denying the Banasiaks' request for a new trial on damages for Mr. Banasiak's pain and suffering and Mrs. Banasiak's claim of loss of consortium.

We now turn to Appellees/Cross Appellants issues on appeal. We must, however, first determine whether Appellees/Cross Appellants preserved their claims for our review. Rule 1925(b) of the Pennsylvania Rules of Appellate Procedure provides, in relevant part, as follows:

> **(b) Direction to File Statement of Errors Complained of on Appeal; Instructions to the Appellant and the Trial Court**. If the judge entering the order giving rise to the notice of appeal ("judge") desires clarification of the errors complained of on appeal, the judge may enter an order directing the appellant to file of record in the trial court and serve on the judge a concise statement of the errors complained of on appeal ("Statement").
>
> ***
>
> **(2) Time for filing and service.**
>
> > (i) The judge shall allow the appellant at least 21 days from the date of the order's entry on the docket for the filing and service of the Statement[.]
>
> ***
>
> **(4) Requirements; waiver.**
>
> > ***
>
> > (vii) Issues not included in the Statement and/or not raised in accordance with the provisions of this paragraph (b)(4) are waived.

Pa.R.A.P. 1925(b)(2)-(4). This Court has consistently held that the "failure to comply with the minimal requirements of Pa.R.A.P. 1925(b) will result in automatic waiver of the issues raised." ***Greater Erie Indus. Dev. Corp. v. Presque Isle Downs, Inc.***, 88 A.3d 222, 224 (Pa. Super. 2014) (*en banc*) (citation omitted); ***see also Commonwealth v. Castillo***, 888 A.2d 775, 780 (Pa. 2005) (explaining that an untimely concise statement waives all claims on appeal); ***Commonwealth v. Lord***, 719 A.2d 306, 309 (Pa. 1998) ("[F]rom this date forward … [a]ppellants must comply whenever the trial court orders them to file a [s]tatement of [errors] [c]omplained of on [a]ppeal pursuant to Rule 1925. Any issues not raised in a 1925(b) statement will be deemed waived.").

Herein, Appellees/Cross Appellants filed their notice of appeal on August 16, 2023. On August 18, 2023, the trial court ordered Appellees/Cross Appellants to file a concise statement within 21 days as permitted by Pa.R.A.P. 1925(b). Trial Court Order, 8/18/23, at *1 (unpaginated). A review of the trial court docket reveals that the clerk of court forwarded the trial court's 1925(b) order to Appellees/Cross Appellants on August 18, 2023. Hence, Appellees/Cross Appellants needed to file their concise statement on or before September 8, 2023. ***See*** Pa.R.A.P. 108(a)(1) ("Except as otherwise prescribed in this rule, in computing any period of time under these rules involving the date of entry of an order by a court or other government unit, the day of entry shall be the day the clerk of the court or the office of the government unit mails or delivers copies of the order to the parties[.]").

Appellees/Cross Appellants, however, did not file a concise statement.[4]  We are therefore precluded from addressing Appellees/Cross Appellants' current claims on appeal.

In sum, we reverse the trial court's order denying the Banasiaks' request for a new trial and remand for a new trial limited to damages for Mr. Banasiak's pain and suffering and Mrs. Banasiak's claim of loss of consortium only.

Judgment entered November 13, 2023 vacated.  Order denying Appellants/Cross Appellees' post-trial motions reversed.  Matter remanded for a new trial limited to damages for Mr. Banasiak's pain and suffering and Mrs. Banasiak's claim of loss of consortium only.  Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/24/2025

---

[4] On November 8, 2023, Appellees/Cross Appellants asked the trial court to file their 1925(b) statement *nunc pro tunc*.  **See** Appellees/Cross Appellants Motion, 11/8/23, at 1.  In their motion, Appellees/Cross Appellants stated that, at the time the trial court's 1925(b) order was mailed, "a key member of defense counsels' administrative team was unexpectedly out of the office due to a medical issue" and, as such, the order "was not scanned and circulated per regular business practices."  **Id.** at 2.  The trial court denied Appellees/Cross Appellants' motion on November 9, 2023.